IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SCANAVERT LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:25-cv-00576-UNA |
| | ) | |
| INNIT, INC., | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

Plaintiff ScanAvert LLC ("ScanAvert" or "Plaintiff"), by its attorneys, demands a trial by jury on all issues so triable and for its complaint against Defendant Innit, Inc. ("Innit" or "Defendant"), and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action for patent infringement under the patent laws of the United States, Title 35, United States Code, Section 271, *et seq.*, involving United States Patent No. 7,805,319 and 8,060,383, collectively, "Asserted Patents," and seeking damages and injunctive relief as provided in 35 U.S.C. §§ 281 and 283–285.  The Asserted Patents are attached hereto as Exhibits A and B, respectively.

## THE PARTIES

2.      Plaintiff is a Delaware Corporation.  Plaintiff may be served with process through its registered agent for service at Corporation Service Company, 251 Little Falls Drive, Wilmington, DE 19808.  Plaintiff is the exclusive licensee of the Asserted Patents with the right to bring this infringement suit.

3.      Defendant is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 600 Allerton Street, Suite 101, Redwood City,

CA 94063.  Defendant may be served through its registered agent, Corporation Service Company, 251 Little Falls Dr., Wilmington, DE 19808.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States, Title 35 United States Code, including 35 U.S.C. § 1, *et seq.*

5.      On information and belief, jurisdiction and venue for this action are proper in this District.  This Court has personal jurisdiction over Defendant because, based on information and belief, it (i) is incorporated in the State of Delaware and this District; (ii) has purposefully availed itself of the rights and benefits of the laws of the State of Delaware and this District; (iii) has done and is doing business in the State of Delaware and this District, directly or through intermediaries, both generally and, on information and belief, with respect to the allegations in this Complaint, including their one or more acts of infringement in the State of Delaware and this District.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), and/or § 1400(b), at least because Defendant is incorporated in the State of Delaware and is, thus, deemed to reside in this District.

## SCANAVERT'S PIONEERING TECHNOLOGY

7.      As of 2001, allergies were believed to be the leading cause of chronic disease, tragically causing significant medical expenses, hospitalizations, and even death.  Allergies, sensitivities, and other conditions were especially problematic for individuals and their caregivers when grocery shopping or selecting medications.  While food and drug labels provide some information, they often provide inadequate or limited information relevant to allergies, sensitivities, dietary regimens, or drug interactions.  Further, not all afflicted individuals, their families, their caregivers, and/or their service providers are capable of reading and parsing all

relevant information from labeling.

8.      In the late 1990s, Ellen Badinelli recognized a problem in the world of health and wellness.  While working at a summer camp, Ms. Badinelli looked for a resource that would help her when shopping for or selecting food and snacks that would be compatible with the allergy, dietary, and medical restrictions for the several hundred children at the camp.  No such resource existed at the time.  She was not able to find resources that would assist her by alerting her when food and snack choices included unwanted ingredients or propose suitable alternatives for those food and snack choices.  Moreover, she could not find handheld, wireless devices that worked with a remote, updatable database that could cross-reference an item with one or more user profiles, thus allowing her freedom to shop in different stores, without being tied to a large device, and without having to spend significant time populating or downloading a database of items and user profiles.

9.      Drawing on her years of experience in the securities industry, in which she developed algorithms to generate alerts for unusual trading, Ms. Badinelli set out to solve these information deficits.  She developed a system and method for a consumer to determine food and medicine interactions, applied for patent protection, and was issued the '319 and '383 patents.

10.      In 2001, Ms. Badinelli founded ScanAvert to promote mobile health access and over time developed an application for in-store kiosks and cell phones that allowed users to create user profiles with their dietary and medical restrictions, scan food and drug labels, and receive alerts when a particular food or drug was inconsistent with that user's dietary and medical restrictions.  The ScanAvert app was used by tens of thousands of users and received acclaim from industry, media, medical professionals, and consumers.  The Healthcare Information and Management Systems Society included the ScanAvert app in its book "mHealth Innovation: Best

Practices from the Mobile Frontier" (2014).

11.    For her innovation, Ms. Badinelli received awards and acclaim, including: (1) earning a Strategic Partnership for Industrial Resurgence grant; (2) winning second place in IEEE's Consumer Communications and Networking 2006's Consumer Application of the Year; (3) being named a finalist in Launch Silicon Valley 2010; (4) being listed in Fast Company Magazine's 2013 list of World's Most Innovative Companies-Food Sector; and (5) earning a 2014 Bronze Edison Award winner in Living, Working & Learning Environments: Learning Support and Behavioral Change.

12.    Ms. Badinelli also received significant attention from the industry and the press. For instance, Ms. Badinelli was interviewed and ScanAvert was featured on MSNBC's Taking Stock with Pimm Fox, and ScanAvert was featured and the ScanAvert app was demonstrated by host Dr. Travis Stork on the CBS talk show The Doctors, also broadcast in syndication.  The ScanAvert app was also featured in Verizon's national "Droid Does" campaign in 2010.

## The Asserted Patents

13.    The Asserted Patents claim priority to two United States provisional patent applications.  On October 17, 2001, Ms. Badinelli filed a United States provisional patent application directed to a "Method and apparatus for a consumer to determine food/medicine interactions on a real-time basis," Application No. 60/329,927.  On May 14, 2002, Ms. Badinelli filed a second provisional patent application, No. 60/380,736.

14.    The '319 patent was filed on January 25, 2008, as United States Patent Application No. 12/020,306, which is a continuation of U.S. Patent Application No. 10/437,582 filed on May 14, 2003, which is a continuation-in-part of U.S. Patent Application No. 10/272,596.

15.    The '383 patent was filed on September 20, 2010, as U.S. Patent Application No.

12/886,216, as a continuation to the '319 patent.

16.    Plaintiff is the owner of the entire right, title, and interest of the Asserted Patents, including the right to sue for and collect past, present, and future damages and to seek and obtain injunctive or any other relief for infringement.

17.    The Asserted Patents are each titled "Systems and methods for a consumer to determine food/medicine interactions" and share a common specification.  The specification discloses several embodiments directed to "detecting harmful and/or hazardous ingredients that may cause an allergic reaction, interfere with the effectiveness of a prescription drug, exacerbate symptoms associated with a chronic illness, and/or cause another undesired reaction." '319 patent, 1:18-23.

18.    As was not possible in the prior art, the invention allows for detection "on a real-time automated basis in places where these commodities are sold, prepared and/or served" using, in one embodiment, a device "to scan their products and their barcode subscriber card in order to receive real-time information related to the compatibility between the product they scanned and their profile." *Id.* at 1:29-37, 2:57-63.  The user profile, in this embodiment, "may contain information regarding a customer's allergies, prescriptions, chronic illness and conditions, and/or specific dietary requirements," and allows the system to compare the composition of a scanned product "with the customer's profile, and alert the customer to the presence of harmful ingredients and/or a prescribed food substance." *Id.* at 2:63-3:3.  In one embodiment, the invention "may generate an alarm for any substance and/or ingredient contained in a product . . . that will cause an undesired, harmful and/or allergic reaction, interfere with the effectiveness of a prescription drug, and/or exacerbate symptoms associated with a chronic illness." *Id.* at 3:4-9.

19.    In two non-limiting examples, the specification discloses the present invention can

be used by (1) "a parent shopping in a supermarket will be able to check that products he or she is purchasing are compatible with the identified allergy of [his or her child] . . . or does not contain substances he or she wishes to avoid" and (2) an elderly person to "easily check the compatibility [of] his or her prescriptions and any product purchased Over The Counter and/or in the grocery aisles." *Id.* at 3:13-24.

20.      The patents explain the patented invention improved on the prior art with a system and method to allow users to check or these "unwanted ingredients" in a real-time, automated, and user-friendly way that would allow all individuals, including for those for whom reading labels is difficult. *Id.* at 2:51-3:56.  As the Asserted Patents explain, at the time, allergies were believed to be "the leading cause of chronic disease in United States, costing the healthcare system about $18 billion dollars [sic] annually," with food allergies causing 30,000 emergency room visits, 2,000 hospitalizations, and 150-200 estimated deaths each year. *Id.* at 1:51-63.  Yet, reading labels "may be a complex and time consuming process" and limited because they do not identify sub-ingredients. *Id.* at 2:6-13.  Further, according to studies, many patients cannot correctly identify their medications and even fewer can identify the indications of their medications. *Id.* at 2:20-25. Moreover, "merely the process of reading food labels may pose great difficulty" for (1) the visually impaired, (2) "[i]ndividuals whose main language is not English," (3) "[i]ndividuals who suffer from learning disabilities, dyslexia, or struggle with literacy," and (4) "[a]ny individual who falls under the American with Disabilities Act, ADA, whose manual dexterity compromises their ability to read labels, e.g., those suffering from Parkinson's Disease, Cerebral Palsy, Muscular Dystrophy, etc." *Id.* at 2:32-44.

**The Asserted Patents' Technological Innovations**

21.      Each of the Asserted Patents addressed technological problems associated with

conventional scanning devices. In the prior art, it was not feasible or practical to use a scanning device while shopping to scan items and identify unwanted ingredients in those items. Such systems were limited because, for instance, they required specialized hardware and software on the user's device. While scanning devices would be able to scan an item in the grocery store, for instance, systems were not available that allowed the user to scan that item, access a remote database with that item's ingredients and indications, compare those ingredients or indications to a user-created profile, and alert the user if any of the ingredients or indications were unwanted.

22.    To address these shortcomings in the prior art, Ms. Badinelli developed an inventive system that allowed, among other things, for a user to get real-time, in-store alerts about the foods and drugs the user was considering for purchase as compared to a user profile specific to the user. As the Asserted Patents explain:

> Under one embodiment of the present invention customers are able to scan their products and their barcode subscriber card in order to receive real-time information related to the compatibility between the product they scanned and their profile . . . . The profile may contain information regarding a customer's allergies, prescriptions, chronic illness and conditions, and/or specific dietary requirements. The system may translate various terminologies used in nutritional and/or ingredients labels, compare the composition information with the customer's profile, and alert the customer to the presence of harmful ingredients and/or a prescribed food substance.

'319 patent, 2:57-67.

23.    The Asserted Patents describe several technological innovations over the prior art. For example, Figure 1, copied below, shows the inventive system architecture of the invention:



FIG.1

24.     As shown in Figure 1, the present invention allowed for the user to employ various devices, like a computer, PDA, mobile phone, or other handheld devices, or a static terminal in the store, as shown in the box labeled "1. Client." *Id.* at 4:23-27.  The user can scan the item bar codes or nutrition labels, which can then be communicated via the internet ("Internet, 2") to a Firewall System 3 to authenticate the user. *Id.* at 4:43-47.  If authenticated, in this embodiment, the user's scanned items can then be checked against the database 6 for ingredients, indications, or other information about the item, and then compared to a user profile stored remotely. *Id* at 5:11-49, 6:21-48.

25.     Prior art systems were not capable of performing the analysis of the Asserted Patents in real-time.  The innovative architecture of the Asserted Patents, and the ordered combination of hardware and software, improved over the prior art in a meaningful way by allowing users and caregivers to access the remotely stored database, the remotely stored user profile, and provide alerts to the user while the user is shopping.  The architecture claimed in the Asserted Patents allowed for this significant technological improvement over the prior art.

26.     Prior art scanning systems for scanning barcodes or labels were also limited in that they typically required the user to employ specialized hardware with specialized software to scan the items in the store.  With the architecture in the Asserted Patents, a user could employ a PDA, mobile device, or similar non-specialized device with access to the internet to scan the item and access the remote database.  *Id.* at 4:23-30.

27.     Prior art scanning devices were also not capable of alerting a user to unwanted ingredients while also determining the compatibility of, and making suggestions for, other items to the user.

28.     Prior art scanning devices were also not capable of delivering compatibility alerts for wanted or preferred substances or quantities of substances, vitamins, or ingredients.

29.     Prior art scanning devices in this field also did not allow for groups of individuals or multiple users on an account or subscription.

30.     During prosecution, to overcome a rejection over the prior art, Ms. Badinelli requested an interview with the examiner to show "the actual commercial embodiment of the claimed invention"; show a "PowerPoint presentation that provides in-depth review of the commercial embodiment"; and to explain the difference between her claimed invention and the prior art.  Ex. C.  The examiner held the interview on May 25, 2010.  *Id.*  By that time, ScanAvert had launched its application compatible with the Android operating system.  At the interview, Ms. Badinelli brought a Motorola Droid mobile phone, with the Android operating system, that had the ability to scan UPC codes and certain grocery items.  She showed the examiner how to set up a user profile, which would be stored on the ScanAvert server.  Then, she scanned a food item incompatible with the user profile, which accessed the remote ScanAvert database and determined the item was incompatible, and the user was alerted to the incompatibility.  Then, she showed the

examiner how the ScanAvert app could immediately generate detailed incompatibility results, if any, along with a list of recommended substitutes compatible with the user's profile. She also showed the examiner how to add prescriptions to a user's profile. After showing the examiner the technological innovation in her ScanAvert system, the examiner allowed the claims with some agreed amendments. Ex. D.

31.     The following videos show demonstrations of the ScanAvert app operating on a Motorola Droid mobile phone, which is illustrative of Ms. Badinelli's presentation provided to the examiner. For instance, ScanAvert posted a video to YouTube fourteen years ago entitled "ScanAvert – Harmful Ingredient Detection for Allergies, Prescriptions, Gluten Free, Organic" in which Ms. Badinelli demonstrates how the ScanAvert app works on a Motorola Droid phone while in a grocery store: https://www.youtube.com/watch?v=RvPQuiFQkCM. Also, the National Academies of Sciences, Engineering, and Medicine posted on YouTube a video entitled "ScanAvert App Demo" showing a June 5, 2012 presentation by Ms. Badinelli at the Health Data Initiative Forum III: The Health Datapalooza: https://www.youtube.com/watch?v=izhSAQLEyXA.

32.     In the demonstration at the Health Data Initiative Forum III: The Health Datapalooza, Ms. Badinelli ran the ScanAvert app on a Motorola Droid phone in June 2012. During the demonstration, she opened the ScanAvert app, which was already logged into a user profile for "Ellen," and displayed the following screen with the option to scan or enter barcodes for items or to edit the user's diets or allowances:



33.   During the presentation, she used the camera on the mobile phone to scan the UPC code for a particular allergy medicine, which returned an incompatibility alert based on the user profile.  In addition to displaying the incompatible alert, the ScanAvert app provided suitable substitutions:



34.    While Ms. Badinelli scanned a medicine in that demonstration, the ScanAvert app could also be used to scan food items as shown in "ScanAvert – Harmful Ingredient Detection for Allergies, Prescriptions, Gluten Free, Organic."

35.    This system architecture was not conventional and constituted a technological innovation over the prior art.  For instance, storing a database of items at a remote server, with the ability to further populate the database, was not conventional and constituted a technological innovation over the prior art.  By housing the database remotely, that allowed the database to be populated by the administrator, the user, or any third party, allowing the system to be updated in real-time and remain up to date for all users.  This innovation allowed the user to access the remote database in the store without spending the time, effort, and processing power to download updates as was required in a conventional system in which the database was stored on the user's device.  Further, by storing the database on a remote server, it allowed the item database to be crowd-

sourced, making the system more efficient and cost-effective.

36.    Similarly, storing the user profiles in a remote database was not conventional for scanning devices at this time, and constituted a technological improvement.  By storing the user profiles on a remote database, it allowed a user, or any third party with access to a user's profile, to use different mobile devices or in-store kiosks to check the ingredients or indications of a particular item.  This was an important technological innovation over the prior art scanning devices because it did not tie the user to a particular scanning device, and allowed greater freedom to use the patented scanning technology with different devices and in different stores.  Further, it allowed a user to set their user profile, and then provide that profile to family, caregivers, shoppers, or other third parties so that third party can scan items on the user's behalf.

37.    None of the specific implementations described in the paragraphs above, as recited in any individual claim, were well-understood, routine, or conventional.  Neither was any ordered combination of any one or more of those implementations as recited in any individual claim, well-understood, routine, or conventional.  The claims and specification recite a specific ordered architecture that constituted a technological innovation over the prior art.  *See, e.g.*, '319 patent, Figs. 1-4, 4:19-7:44.

## DEFENDANT'S WILLFUL INFRINGEMENT

38.    On information and belief, Shopwell introduced its Shopwell application (the "Shopwell app" or "Accused Product") in or around October 2010, after the launch of ScanAvert's mobile application.  By 2015, Shopwell's CEO stated that the industry was at an "inflection point" because "health-conscious consumers want help making smart choices at the grocery store" including "shoppers and their families trying to adhere to special dietary restrictions, manage disease     states,     or     avoid     the     consequences     of     allergens." https://www.mobihealthnews.com/47470/shopwell-raises-3-4m-for-app-that-offers-shoppers-

healthier-food-alternatives.

39.    Innit    acquired    Shopwell    and    the    Shopwell    app    in    2017.

https://www.eweek.com/cloud/startup-innit-acquires-food-resource-app-maker-shopwell/    On

information and belief, the Shopwell app provided consumers with personalized nutrition

recommendations, allergy alerts, and ingredient analysis based on a user's profile.

40.    Since 2017, Innit has made, used, sold, offered for sale, and offered for download

the Shopwell app as part of its Food Intelligence Platform.

41.    Shopwell was well aware of the ScanAvert app, which was commonly identified as

a competitor to Shopwell.    https://www.mobihealthnews.com/47470/shopwell-raises-3-4m-for-

app-that-offers-shoppers-healthier-food-alternatives.

42.    On information and belief, Shopwell also had knowledge of the Asserted Patents

as early as November 2015.  In October and November 2015, Ms. Badinelli contacted Shopwell

executives and Shopwell's investors regarding the Asserted Patents and the ScanAvert technology.

Ms. Badinelli conferred with Shopwell in August 2016 regarding the parties' respective

technologies.  During that conference, and in later correspondence, Ms. Badinelli and Shopwell

discussed the Asserted Patents.

43.    On information and belief, Innit became aware of ScanAvert and the Asserted

Patents by no later than its acquisition of Shopwell in 2017.  When Innit acquired Shopwell, Innit

praised the Shopwell app's "rich database" and that it is "a great resource for people who have

allergies, dietary restrictions or health issues."    https://www.eweek.com/cloud/startup-innit-

acquires-food-resource-app-maker-shopwell/.    Innit would have been aware of Shopwell's

competitors, including ScanAvert.  Further, during its due diligence, Innit would have learned

about ScanAvert and the Asserted Patents.

44.     In March 2022, Ms. Badinelli informed Innit that the Shopwell app was infringing the Asserted Patents and offered Innit an opportunity to take a license.  The parties engaged in a series of negotiations, but the parties were not able to reach agreement on the terms of a license. Despite its knowledge that it was infringing the Asserted Patents, Innit did not take a license and continued to infringe the Asserted Patents thereafter.

### COUNT I – INFRINGEMENT OF U.S. PATENT NO. 7,805,319

45.     Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

46.     Innit made, used, offered for sale, sold, and/or imported products, including at least the Accused Product, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '319 patent in violation of 35 U.S.C. § 271(a), including claim 1.  As shown below, on information and belief, the Accused Product practices each step of the method in claim 1 of the '319 patent.

47.     Innit's Shopwell app performed a method for determining food or medicine interaction of a user.  The Shopwell app and Innit/Shopwell servers, which hosts food ingredient information for products, determines food recommendations, and provides alerts based on a user's profile, lifestyle goals, dietary habits, or other criteria.





https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

48.    Innit's Shopwell app populated, by a programmable device, a database, that correlates (i) a first product identifier corresponding to at least one ingredient of a first product, and (ii) a second product identifier corresponding to at least one ingredient of a second product. On information and belief, the Innit/Shopwell app, or an Innit/Shopwell agent or vendor working at Innit/Shopwell's direction, populated its database through its server using one or more frontend and/or backend programmable devices, with information about a first and second product (e.g., peanut butter, *see above*, and Sweet Greens, *see below*) through a first product identifier (e.g., barcode label information found on the peanut butter jar and the Sweet Greens bottle) such that the Shopwell app may retrieve and display the first product's details including ingredients, match score, and other information.  This is evidenced by the Shopwell app subscriber's ability to use their mobile device that has built-in barcode scanning capability and utilizes the device's camera module to scan and transmit food product information for more than two food items to the Innit/Shopwell servers:



[https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s](https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s), accessed on August 24, 2025.

49.     Innit's Shopwell app created and maintained via the Internet utilizing a web-based mechanism, at least a first user profile, comprising user health information for a plurality of users. For example, the Shopwell app, created and maintained via the Internet and through the app's interface (a web-based mechanism) a first user profile based on user information, such as email address, demographics, health information, food preferences, dietary restrictions, and allergies. Innit/Shopwell created and maintained such profiles for a plurality of users, as evidenced by Innit's support pages related to user profiles:



Innit Support (US) › Getting started

## How can I personalize my profile with Innit?



Uzair
November 20, 2017 17:01

FOLLOW

We personalize your meal recommendations based on all the information we have about you: allergens, dislikes, and and specific diet you follow. The more information we have, the better our recommendations will be.

You can add allergens, dislikes, or diets to your profile upfront once you create your account.

If you skip onboarding or want to update your profile later, no worries, you can do that right in your profile settings.

https://support.innit.com/hc/en-us/articles/115003778954-How-can-I-personalize-my-profile-with-Innit-

(June 18, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210618093404/https://support.innit.com/hc/en-us/articles/115003778954-How-can-I-personalize-my-profile-with-Innit-.

The user had the ability to update its user profile in the Shopwell app to include allergy information as shown below:



Innit Support (US) › Nutrition

## What if I (or members of my family) have food allergies?



Astrid from Innit
December 02, 2017 19:32

FOLLOW

No problem! We'll only display meals that work for you and your family's dietary needs. We just need to know what those food allergies are — you can add them to your profile.

https://support.innit.com/hc/en-us/articles/115004095354-What-if-I-or-members-of-my-family-have-food-allergies- (Feb. 24, 2021), accessed via Internet Archive at https://web.archive.org/web/20210224234036/https://support.innit.com/hc/en-us/articles/115004095354-What-if-I-or-members-of-my-family-have-food-allergies-.

50.    Innit's Shopwell app scanned a first product by at least one hand-held communication device, wherein the first product includes indicia associated with the first product identifier, and captured, in real-time, the first product identifier.  For example, Shopwell app used the user's smartphone (hand-held device) to scan, in real-time, a first product's bar code or nutritional label comprising the first product identifier.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

51.    Innit's Shopwell app transmitted, in real-time, the first product identifier from the

at least one hand-held communication device to the database.  For example, on information and belief, after scanning the product's barcode, the Shopwell app transmitted over an internet connection the coded information in the barcode, or the identifying information to Innit/Shopwell's servers and remotely stored database.  In October 2018, it was reported the Innit/Shopwell database included over 800,000 food items, and the iOS and Android apps were integrated with Innit's remote database to allow for data to be transmitted to the database to return information about and relevant to that food item.      https://venturebeat.com/ai/innits-new-shopwell-app-serves-up-nutrition-profiles-for-foods/, accessed on April 25, 2025.

52.    Innit's Shopwell app compared, in real-time, the first user profile to the first product identifier corresponding to the at least one ingredient of the first product obtained from the database.  For example, Innit/Shopwell compared, via its servers and database, the user's profile information, such as food preferences, dietary restrictions, and goals with the first product identifier that corresponds to one or more ingredients of the first food product.



**It's Personal**

Every body is different and our food choices should reflect that. Create your Food Profile to learn how products match with your needs, goals and lifestyle not an average.



[https://www.innit.com/shopwell](https://www.innit.com/shopwell) (February 28, 2021), accessed via Internet Archive at

[https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell](https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell).

53.    Innit's Shopwell app transmitted, in real-time, to the at least one hand-held communication device, the results of the comparison of the first user profile to the first product identifier corresponding to the at least one ingredients of the first product, wherein the results are used to: (1) output an alert when the first product, based on the first user profile, includes a harmful ingredient; and (2) output an alert when the first product, based on the first user profile, includes a recommended ingredient.  For example, the Shopwell app returns the results (transmitted from the servers) on the user's device based on the comparison done between the product ingredients and the user's profile.  On information and belief, the results indicate the ingredients that are recommended as well as the harmful ingredients that should be avoided, and the user is alerted with a match score suggesting whether the product meets the dietary preference threshold or not.



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

As shown in an Innit marketing video regarding the Shopwell app, the user will be provided alerts

regarding what products or ingredients to avoid, as well as what products are a better match for a

user according to their profile:



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.

54.    Innit's Shopwell app scanned a second product by the at least one hand-held communication device, wherein the second product includes indicia associated with the second product identifier, and captured, in real-time, the second product identifier. For example, Shopwell

app used the user's smartphone (hand-held device) to scan, in real-time, a second product's bar code or nutritional label comprising the second product identifier.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

55.     Innit's Shopwell app transmitted, in real-time, the second product identifier from the at least one hand-held communication device to the database.  For example, on information and belief, after scanning the product's barcode, the Shopwell app transmitted over an internet connection the coded information in the barcode, or the identifying information to Innit/Shopwell's servers and remotely-stored database.  In October 2018, it was reported the Innit/Shopwell database included over 800,000 food items, and the iOS and Android apps were integrated with Innit's remote database to allow for data to be transmitted to the database to return information about and relevant to that food item.  https://venturebeat.com/ai/innits-new-shopwell-app-serves-

up-nutrition-profiles-for-foods/, accessed on April 25, 2025.

56.     Innit's Shopwell app compared, in real-time, the first user profile to the second product identifier corresponding to the at least one ingredients of the second product obtained from the database.   For example, Innit/Shopwell compared, via its servers and database, the user's profile information, such as food preferences, dietary restrictions, and goals with the first product identifier that correspondents to one or more ingredients of the first food product.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell

57.     Innit's Shopwell app transmitted, in real-time, to the at least one hand-held communication device, the results of the comparison of the first user profile to the second product identifier corresponding to the at least one ingredients of the second product, wherein the results

were used to: (1) output an alert when the second product, based on the first user profile, includes a harmful ingredient; and (2) output an alert when the second product, based on the first user profile, includes a recommended ingredient.  For example, the Shopwell app returns the results (transmitted from the servers) on the user's device based on the comparison done between the product ingredients and the user's profile.  On information and belief, the results indicate the ingredients that are recommended as well as the harmful ingredients that should be avoided, and the user is alerted with a match score suggesting whether the product meets the dietary preference threshold or not.



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

As shown in an Innit marketing video regarding the Shopwell app, the user will be provided alerts regarding what products or ingredients to avoid, as well as what products are a better match for a user according to their profile:



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.

58.    Innit directed or controlled every aspect of the Shopwell app functionality such that all steps of claim 1 of the '319 patent were automatically performed by equipment or functions controlled by Innit and/or with Innit's continuous direct control.

59.    On information and belief, with knowledge of the '319 patent, Innit actively induced and continue to induce the direct infringement of one or more claims of the '319 patent, including claim 15, in violation of 35 U.S.C. § 271(b) by their customers and/or end users of their products, including at least the Accused Products, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '319 patent, including claim 15, with the intent to encourage those customers and/or end-users to infringe the '319 patent.

60.    By way of example, on information and belief, Innit actively induced infringement of the '319 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who download, purchase, test, operate, and use Innit's products, including at least the Accused Product, to make, use, sell, and/or offer to sell Innit's products, including at least the Accused Product, in a manner that infringes at least one claim of the '319 patent, including claim 1.  For example, as described above, Innit actively marketed, advertised, offered for sale, and/or otherwise promoted the Accused Product on their website and in application marketplaces.  Therein, on information and belief, Innit described and touted the use of the subject matter claimed in the '319 patent.

61.    On information and belief, with knowledge of the '319 patent, Innit also contributed to the infringement of one or more claims of the '319 patent in violation of 35 U.S.C. § 271(c),

including claim 1, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused Product, knowing the same to be especially made or especially adapted for use in an infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use. For instance, Innit made, used, offered to sell, and/or offered for download the Accused Product as a component of its Food Intelligence platform. This is evidenced by, among other things, the design, configuration, and functionality of the Accused Product, which is especially made or especially adapted to infringe the '319 patent when used for its normal and intended purpose. This is also evidenced by, among other things, Innit's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Product and demonstrate that the Accused Product is especially made or especially adapted for a use that infringes the '319 patent.

62.    Innit's infringement has been knowing, intentional, and willful. On information and belief, Innit has known of the existence of the '319 patent, and its acts of infringement have been willful and in disregard of the '319 patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct.

63.    Plaintiff is entitled to recover from Innit damages at least in an amount adequate to compensate for their infringement of the '319 patent, pursuant to 35 U.S.C. § 284, together with interest and costs fixed by the Court.

64.    To the extent this case is determined to be exceptional, Plaintiff is entitled to an award of attorney's fees pursuant to 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 8,060,383

65.    Plaintiff incorporates by reference the allegations contained in the preceding paragraphs.

66.    Innit made, used, offered for sale, sold, and/or imported products, including at least the Accused Product, that infringe, either literally or under the doctrine of equivalents, one or more claims of the '383 patent in violation of 35 U.S.C. § 271(a), including claim 1.  As shown below, on information and belief, the Accused Product practices each element of the system in claim 1 of the '383 patent.

67.    Innit's Shopwell app was a system for determining food or medicine interaction of a user.  The Shopwell app and Innit/Shopwell servers, which hosts food ingredient information for products, determines food recommendations, and provides alerts based on a user's profile, lifestyle goals, dietary habits, or other criteria.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

68.     Innit's Shopwell app included a memory having at least one region for storing computer executable program code.  For example, Innit's Shopwell services were hosted on their computer systems, which on information and belief, included a memory in its backend system to store Shopwell app code that is transmitted to the user's device through the application.  Innit's Terms of Services show the services are hosted in a memory of their backend computers and servers.

# Terms of Service

## 1. Terms of Service

The Innit website located at www.innit.com (the "Website") and the Innit mobile application ("Mobile App") are copyrighted works belonging to Innit, Inc. (referred to herein as "Innit"). Innit provides a connected food platform that empowers users and their families with advanced, personalized features spanning the entire food lifecycle, from meal planning, shopping and preparation, to automated cooking on smart appliances with which the Mobile App and/or Website may interface ("Connected Appliances"). Such services may be accessed through the Website, Connected Appliances, and/or the Mobile App (such services, the Website, and the Mobile App, collectively the "Services"). This Terms of Service Agreement ("Agreement") sets forth the legally binding terms for your use of the Services. This Agreement is accepted by your accessing and/or use of the Services. You may not access and/or use the

https://www.innit.com/en-GB/tos/ (December 16, 2021), accessed via Internet Archive at https://web.archive.org/web/20210507050102/https://www.innit.com/en-GB/tos/.

69.     Innit's Shopwell app included a processor for executing the program code stored in the memory.  On information and belief, Innit included a processor in its backend server system for executing the Shopwell app code stored in the memory.  For instance, Innit's Terms of Services show the services are hosted in a memory of their backend computers and servers.

7.2. In addition, you agree not to use the Services to: (a) upload, transmit, or distribute any computer viruses, worms, or any software intended to damage or alter a computer system or data; (b) send unsolicited or unauthorized advertising, promotional materials, junk mail, spam, chain letters, pyramid schemes, or any other form of duplicative or unsolicited messages, whether commercial or otherwise; (c) harvest, collect, gather or assemble information or data regarding other users, including e-mail addresses, without their consent; (d) interfere with or disrupt servers or networks connected to the Services or violate the regulations, policies or procedures of such networks or otherwise interferes with our operation or provision of the Services; (e) attempt to gain unauthorized access to the Services, other computer systems or networks connected to or used together with the Services, through password mining or other means; or (f) harass or interfere with another user's use and enjoyment of the Services.

https://www.innit.com/en-GB/tos/ (December 16, 2021), accessed via Internet Archive at https://web.archive.org/web/20210507050102/https://www.innit.com/en-GB/tos/.

70.     Innit's Shopwell services included code to populate, by a programmable device, a database, that correlates at least i) a first product identifier corresponding to at least one ingredient

31

of a first product; and ii) a second product identifier corresponding to at least one ingredient of a second product.  On information and belief, the Innit/Shopwell app, or an Innit/Shopwell agent or vendor working at Innit/Shopwell's direction, populated its database through its server using one or more frontend and/or backend programmable devices, with information about a first and second product (e.g., peanut butter, *see above*, and Sweet Greens, *see below*) through a first product identifier (e.g., barcode label information found on the peanut butter jar and the Sweet Greens bottle) such that the Shopwell app may retrieve and display the first product's details including ingredients, match score, and other information.   This is evidenced by the Shopwell app subscriber's ability to use their mobile device that has built-in barcode scanning capability and utilizes the device's camera module to scan and transmit food product information for more than two food items to the Innit/Shopwell servers:



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.

71.    Innit's Shopwell app included code to create and maintain via the Internet utilizing a web-based mechanism, at least a first user profile, comprising user health information for a plurality of users.  For example, the Shopwell app, created and maintained via the Internet and through the app's interface (a web-based mechanism) a first user profile based on user information, such as email address, demographics, health information, food preferences, dietary restrictions,

and allergies. Innit/Shopwell created and maintained such profiles for a plurality of users, as evidenced by Innit's support pages related to user profiles:



Innit Support (US) › Getting started

## How can I personalize my profile with Innit?

Uzair
November 20, 2017 17:01

FOLLOW

We personalize your meal recommendations based on all the information we have about you: allergens, dislikes, and and specific diet you follow. The more information we have, the better our recommendations will be.

You can add allergens, dislikes, or diets to your profile upfront once you create your account.

If you skip onboarding or want to update your profile later, no worries, you can do that right in your profile settings.

https://support.innit.com/hc/en-us/articles/115003778954-How-can-I-personalize-my-profile-with-Innit-

(June 18, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210618093404/https://support.innit.com/hc/en-us/articles/115003778954-How-can-I-personalize-my-profile-with-Innit-.

The user had the ability to update its user profile in the Shopwell app to include allergy information as shown below:



Innit Support (US) › Nutrition

# What if I (or members of my family) have food allergies?

**Astrid from Innit**
December 02, 2017 19:32

FOLLOW

No problem! We'll only display meals that work for you and your family's dietary needs. We just need to know what those food allergies are — you can add them to your profile.

https://support.innit.com/hc/en-us/articles/115004095354-What-if-I-or-members-of-my-family-have-food-allergies- (Feb. 24, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210224234036/https://support.innit.com/hc/en-us/articles/115004095354-What-if-I-or-members-of-my-family-have-food-allergies-.

72.    Innit's Shopwell app included code to capture, in real-time, a first product identifier received by scanning a first product by at least one hand-held communication device, wherein the first product includes indicia associated with the first product identifier.  For example, Shopwell app used the user's smartphone (hand-held device) to scan, in real-time, a first product's bar code or nutritional label comprising the first product identifier.





https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

73.     Innit's Shopwell app included code to transmit, in real-time, the first product identifier from the at least one hand-held communication device to the database.  For example, on information and belief, after scanning the product's barcode, the Shopwell app transmitted over an internet connection the coded information in the barcode, or the identifying information to Innit/Shopwell's servers and remotely-stored database.   In October 2018, it was reported the Innit/Shopwell database included over 800,000 food items, and the iOS and Android apps were integrated with Innit's remote database to allow for data to be transmitted to the database to return information about and relevant to that food item.   https://venturebeat.com/ai/innits-new-shopwell-app-serves-up-nutrition-profiles-for-foods/, accessed on April 25, 2025.

74.     Innit's Shopwell app included code to compare, in real-time, the first user profile to the first product identifier corresponding to the at least one ingredient of the first product obtained from the database.  For example, Innit/Shopwell compared, via its servers and database, the user's profile information, such as food preferences, dietary restrictions, and goals with the first product identifier that corresponds to one or more ingredients of the first food product.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

75.     Innit's Shopwell app included code to transmit, in real-time, to the at least one hand-held communication device, the results of the comparison of the first user profile to the first product identifier corresponding to the at least one ingredient of the first product, wherein the results are used to: (1) output an alert when the first product, based on the first user profile, includes a harmful ingredient; and (2) output an alert when the first product, based on the first user profile, includes a recommended ingredient.  For example, the Shopwell app returns the results (transmitted from the servers) on the user's device based on the comparison done between the product ingredients and the user's profile.  On information and belief, the results indicate the ingredients that are recommended as well as the harmful ingredients that should be avoided, and

the user is alerted with a match score suggesting whether the product meets the dietary preference threshold or not.



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

As shown in an Innit marketing video regarding the Shopwell app, the user will be provided alerts regarding what products or ingredients to avoid, as well as what products are a better match for a user according to their profile:



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.

76.     Innit's Shopwell app included code to capture, in real-time, a second product identifier received by scanning a second product by the at least one hand-held communication device, wherein the second product includes indicia associated with the second product identifier.

For example, Shopwell app used the user's smartphone (hand-held device) to scan, in real-time, a second product's bar code or nutritional label comprising the second product identifier.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

77.     Innit's Shopwell app included code to transmit, in real-time, the second product identifier from the at least one hand-held communication device to the database.  For example, on information and belief, after scanning the product's barcode, the Shopwell app transmitted over an internet connection the coded information in the barcode, or the identifying information to Innit/Shopwell's servers and remotely-stored database.  In October 2018, it was reported the Innit/Shopwell database included over 800,000 food items, and the iOS and Android apps were integrated with Innit's remote database to allow for data to be transmitted to the database to return information about and relevant to that food item.  https://venturebeat.com/ai/innits-new-shopwell-

app-serves-up-nutrition-profiles-for-foods/, accessed on April 25, 2025.

78.     Innit's Shopwell app included code to compare, in real-time, the first user profile to the second product identifier corresponding to the at least one ingredients of the second product obtained from the database.  For example, Innit/Shopwell compared, via its servers and database, the user's profile information, such as food preferences, dietary restrictions, and goals with the first product identifier that correspondents to one or more ingredients of the first food product.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell

79.     Innit's Shopwell app included code to transmit, in real-time, to the at least one hand-held communication device, the results of the comparison of the first user profile to the second product identifier corresponding to the at least one ingredient of the second product,

wherein the results are used to: (1) output an alert when the second product, based on the first user profile, includes a harmful ingredient; and (2) output an alert when the second product, based on the first user profile, includes a recommended ingredient.  On information and belief, the results indicate the ingredients that are recommended as well as the harmful ingredients that should be avoided, and the user is alerted with a match score suggesting whether the product meets the dietary preference threshold or not.



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.



https://www.innit.com/shopwell (February 28, 2021), accessed via Internet Archive at

https://web.archive.org/web/20210228013931/https://www.innit.com/shopwell.

As shown in an Innit marketing video regarding the Shopwell app, the user will be provided alerts

regarding what products or ingredients to avoid, as well as what products are a better match for a user according to their profile:



https://www.youtube.com/watch?v=HWQH5je4CMs&t=6s, accessed on August 24, 2025.

80.    Innit directed or controlled every aspect of the Shopwell app functionality such that

all steps of claim 1 of the '383 patent were automatically performed by equipment or functions controlled by Innit and/or with Innit's continuous direct control.

81.    On information and belief, with knowledge of the '383 patent, Innit actively induced and continue to induce the direct infringement of one or more claims of the '383 patent, including claim 15, in violation of 35 U.S.C. § 271(b) by their customers and/or end users of their products, including at least the Accused Product, by selling, providing support for, providing instructions for use of, and/or otherwise encouraging its customers and/or end-users to directly infringe, either literally and/or under the doctrine of equivalents, one or more claims of the '383 patent, including claim 15, with the intent to encourage those customers and/or end-users to infringe the '383 patent.

82.    By way of example, on information and belief, Innit actively induced infringement of the '383 patent by encouraging, instructing, and aiding one or more persons in the United States, including but not limited to customers and end users who download, purchase, test, operate, and use Innit's products, including at least the Accused Product, to make, use, sell, and/or offer to sell Innit's products, including at least the Accused Product, in a manner that infringes at least one claim of the '383 patent, including claim 1.  For example, as described above, Innit actively marketed, advertised, offered for sale, and/or otherwise promoted the Accused Product on their website and in application marketplaces.  Therein, on information and belief, Innit described and touted the use of the subject matter claimed in the '383 patent.

83.    On information and belief, with knowledge of the '383 patent, Innit also contributed to the infringement of one or more claims of the '383 patent in violation of 35 U.S.C. § 271(c), including claim 1, by making, using, offering to sell or selling and/or importing a patented component or material constituting a material part of the invention, including at least the Accused

Product, knowing the same to be especially made or especially adapted for use in an infringement and not a staple article or commodity of commerce suitable for substantial non-infringing use.  For instance, Innit made, used, offered to sell, and/or offered for download the Accused Product as a component of its Food Intelligence platform.  This is evidenced by, among other things, the design, configuration, and functionality of the Accused Product, which is especially made or especially adapted to infringe the '383 patent when used for its normal and intended purpose.  This is also evidenced by, among other things, Innit's informational and promotional materials described above, which describe the normal use and intended purpose of the Accused Product and demonstrate that the Accused Product is especially made or especially adapted for a use that infringes the '383 patent.

84.     Innit's infringement has been knowing, intentional, and willful.  On information and belief, Innit has known of the existence of the '383 patent, and its acts of infringement have been willful and in disregard of the '383 patent, without any reasonable basis for believing that it had a right to engage in the infringing conduct.

85.     Plaintiff is entitled to recover from Innit damages at least in an amount adequate to compensate for their infringement of the '383 patent, pursuant to 35 U.S.C. § 284, together with interest and costs fixed by the Court.

86.     To the extent this case is determined to be exceptional, Plaintiff is entitled to an award of attorney's fees pursuant to 35 U.S.C. § 285.

## **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable as such.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff ScanAvert LLC requests that the Court enter judgment for Plaintiff and against Defendant Innit, Inc. and enter the following relief:

A.    A judgment that Defendant infringed U.S. Patent No. 7,805,319;

B.    A judgment that Defendant infringed U.S. Patent No. 8,060,383;

C.    An award of damages to Plaintiff arising from Defendant's past infringement, including compensatory damages;

D.    A determination that this is an exceptional case and awarding Plaintiff's attorneys' fees pursuant to 35 U.S.C. § 285;

E.    An order awarding Plaintiff costs and expenses in this action;

F.    An order awarding Plaintiff pre- and post-judgment interest on its damages; and

G.    An award to Plaintiff of such further relief at law or in equity as the Court deems just and proper.

ASHBY & GEDDES

*/s/ Brian A. Biggs*

Andrew C. Mayo (#5207)
Brian A. Biggs (#5591)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
amayo@ashbygeddes.com
bbiggs@ashbygeddes.com

Dated: May 9, 2025

*Attorneys for Plaintiff ScanAvert LLC*